Filed 4/27/21  Rebolledo v. Nuevo CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| LIANNA REBOLLEDO, | B303332 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC695003) |
| v. | |
| HOMBRE NUEVO, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert S. Draper, Judge.  Affirmed.

Cristal Law Offices, Cristal L. Cabrera; G-ROD Law and Griselda S. Rodriguez for Plaintiff and Appellant.

Andrade Gonzalez, Sean A. Andrade and Henry H. Gonzalez for Defendant and Respondent.

Plaintiff Lianna Rebolledo appeals from a judgment in favor of her former employer, defendant Hombre Nuevo (HN), after the trial court granted HN's motion for summary judgment on all claims in Rebolledo's complaint against HN. Rebolledo's complaint alleges that HN's termination of her employment violated public policy and the Fair Employment and Housing Act (the FEHA), that HN employees made defamatory statements about her in discussing her discharge with HN students and volunteers, that HN did not provide her with a copy of her complete personnel file in the manner required by Labor Code section 1198.5, and that the statutory violations Rebolledo alleges constitute actionable unlawful business practices under Business and Professions Code section 17200. We conclude that HN met its burden of establishing that there is no triable issue of material fact as to any of Rebolledo's causes of action. Accordingly, we affirm.

## FACTUAL BACKROUND

HN is a Catholic nonprofit organization that operates a radio station, Guadalupe Radio, and Escuela de la Fe*,* a religious institute. Escuela de la Fe offers various courses taught by volunteers (referred to as trainers, or *formadores*) at HN's facilities in El Monte and local parishes in Los Angeles.

HN hired Rebolledo in August 2013 as an assistant at Guadalupe Radio, and she later became the coordinator for Escuela de la Fe. As coordinator, her responsibilities included recruiting and coordinating trainers and volunteers for Escuela de la Fe, increasing Escuela de la Fe's enrollment, promotions, inventory, publicity, and public relations. Rebolledo's immediate supervisor testified—and HN does not dispute—that Rebolledo performed her job duties satisfactorily.

### A. *Rebolledo's Diagnosis of Cysts Requiring Surgery*[1]

In late 2016, Rebolledo's doctor, Dr. Rumi K. Lakha, found what he believed were lumps in her breasts. Dr. Lakha referred Rebolledo to the Downey Breast Center, where she was diagnosed with having various cysts that required further examination. In November 2016, Rebolledo's doctor told her she would need surgery, and that her surgery "was being programmed to take place in January of 2017."

### B. *Rebolledo's 2016 Requests for Leave*

In November 2016, Rebolledo informed Father Carlos Orozco, the director of Escuela de la Fe at the time, that she would need one to two months off for surgery beginning sometime in January 2017. Orozco responded that Rebolledo should try to leave everything at work in order before taking time off and directed her to speak with Elvia Arango and Rosalba Cervantes, who handled personnel and human resource matters.

In November or December 2016, Rebolledo told Cervantes she would need time off for her surgery beginning in January 2017 (without providing a specific date), to which Cervantes replied, "That's fine. That'll be fine."[2] Also in November or

---

[1] HN disputes whether Rebolledo was diagnosed with breast cancer and whether she ever had surgery. However, as discussed below, we view the evidence in the light most favorable to Rebolledo (see *Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1109 (*Loggins*)), and doing otherwise on this particular point would not affect our ultimate disposition on appeal in any event.

[2] Although Rebolledo disputes Arango's deposition testimony that she responded in a similar manner when

December 2016, Rebolledo sent Arango an email requesting the time off in writing, and "mentioned [her] medical reasons." In discussing her upcoming absence with Cervantes in November 2016, Rebolledo "offered to help move the Escuela de la Fe office items into the main building of HN," as the Escuela de la Fe office building was going to be demolished. Rebolledo also offered to train someone to replace her during her upcoming absence.

In December 2016, Rebolledo discussed her upcoming absence with Cervantes again, as well as her related offer of help with the office move and to train a temporary replacement. They also discussed the monthly report Rebolledo would need to complete before her absence, and that Rebolledo would need to "submit everything that was related to the upcoming classes for the month of January 2017" before her time off as well.

### C. *Rebolledo's January 5, 2017 Car Accident, Doctor's Visit, and Doctor's Note*

On January 5, 2017, Rebolledo was involved in a car accident before work. Although she did not suffer any physical injuries in the accident, "[she] was scared, anxious and fearful because the accident occurred on a rainy day on the freeway." She left early from work that day to see her doctor (Dr. Lakha). Dr. Lakha provided her a note stating that Rebolledo "received treatment at [his] office" and "require[d] a medical leave of absence from [January 5, 2017] to [January 12, 2017]." The note did not specify why Rebolledo required leave. However, as of January 5, 2017, Rebolledo still did not know what date

---

Rebolledo informed Arango in November or December 2016 that Rebolledo needed time off, Rebolledo does not maintain, or offer any evidence to suggest, that Arango denied any such request in November or December 2016.

4

her surgery was scheduled, and she does not argue (nor does anything in the record suggest) that the cysts in her breasts required her to take leave beginning on January 5, 2017.

Rebolledo informed Cervantes via phone that same evening that she had received a doctor's note "excus[ing] [her] off of work." The next day (January 6, 2017), Rebolledo went to HN and provided Cervantes with her January 5 doctor's note. At that time, Cervantes informed Rebolledo she "could not leave work until [Rebolledo] provided the yearly and monthly reports, the annual reports, inventory, work plan ahead, and work plan." Rebolledo stated she had completed the reports, but Arango responded the reports needed to be formatted differently and that Rebolledo needed to reformat them. Cervantes and Arango also informed Rebolledo that she needed to train two individuals before taking her leave as well.

On January 9, 2017, Rebolledo learned that her surgery would take place on January 27, 2017.

Rebolledo completed the requested reports in the required format on January 10, 2017, and finished training the two individuals on January 11, 2017.

### D. *Rebolledo's January 12, 2017 Doctor's Note and Resulting Leave*

On January 12, 2017, Rebolledo obtained another doctor's note from Dr. Lakha indicating that Rebolledo had "received treatment at [his] office" and "require[d] a medical leave of absence from Jan[uary] 12[,] 2017 to Jan[uary] 31[,] 2017." Although her surgery was not scheduled until two weeks into that period, according to Rebolledo, she "needed this time because of the additional stress that [she] was undergoing because of all the reports that [Cervantes and Arango] were having [her]

5

prepare and submit, . . . coupled with the date for the January class enrollments."

Rebolledo provided the January 12th note to Cervantes. No one at HN expressly approved or denied the request for leave included in the note, but Rebolledo did not return to work beginning January 12, 2017. Rebolledo does not contend that anyone at HN indicated to her after that point that she had to return to work or was not permitted to take leave.

### E.     *Rebolledo's January 27, 2017 Doctor's Note and Additional Time Off*

Rebolledo underwent surgery on January 27, 2017. On January 30, 2017, Rebolledo submitted another note from Dr. Lakha dated January 27, 2017 indicating Rebolledo required additional time off of work until February 28, 2017. Rebolledo did not receive a response, and indicated in an email that she would instead use her personal time, sick time, and vacation days until returning to work.[3] Rebolledo does not contend that anyone at HN indicated to her after that point that she had to return to work or was not permitted to take the additional time off she requested.

---

[3] Rebolledo's declaration indicates that she submitted the third doctor's note to HN on January 30, 2017, but that she emailed HN on January 27, 2017 "[b]ecause [she] did not hear about [her] doctor's note." Obviously, Rebolledo could not have been emailing HN regarding HN's lack of response to a note she had not yet provided. Nevertheless, when Rebolledo informed HN that she would use her sick and vacation days to extend her leave past January 31, 2017 does not affect our analysis on appeal.

**F.** *Rebolledo's Communications with HN During Her Leave*

During her time off, Rebolledo had several communications via email, text, and phone with HN employees and volunteers regarding issues that HN would later cite as the basis for terminating her employment.

**1.    Text messages with trainer Marco Valenzuela**

On January 26, 2017, Rebolledo sent a text to Marco Valenzuela, an Escuela de la Fe trainer, saying, "Would you come with us, or would you stay with Guadalupe Radio?" Moments after sending that text, Rebolledo followed up with a text saying, "Please don't mention this to anyone else." HN characterizes this text as reflecting efforts by Rebolledo to persuade trainers to leave HN and join Rebolledo in a new, competing school. Rebolledo testified that Valenzuela initiated this text exchange, and that it was in fact Valenzuela who asked Rebolledo about starting a new school. Rebolledo contends that a more complete version of the text exchange would support this, but if either party produced one, it does not appear in the record on appeal. It is undisputed that trainers had in the past approached Rebolledo about starting a new school, and that Rebolledo declined. Rebolledo contends that these discussions, as well as her discussion with Valenzuela, arose in the context of trainers' concerns that, after the Escuela de la Fe office was demolished, the school would not reopen. Rebolledo testified that she had no intention to, and never did, form a new school.

7

### 2. Communications regarding HN participation at the Mujeres de Fe Congreso

On February 3, 2017, the day before the Mujeres de Fe Congreso, a religious convention at which HN had in the past had a booth, Rebolledo sent an email to all of Escuela de la Fe's trainers. The exact contents and meaning of the email are the subject of dispute, and the record does not contain an English language version thereof. Rebolledo admitted at deposition, however, that the email informed the trainers that HN would not have a booth at the event. According to Rebolledo, trainers had been contacting her while she was on leave to ask whether there would be such a booth, since Rebolledo was typically the one who organized HN's participation at the event. Rebolledo assumed there would not be a booth, given that she had not organized one, but did not confirm this with anyone at HN before so informing the trainers. Rebolledo learned after sending the email that HN did have a booth at the event.

### 3. Communications regarding curtains

During Rebolledo's time off, Cervantes contacted Rebolledo regarding curtains in the Escuela de la Fe office that appeared to be missing. Rebolledo initially told Cervantes that the curtains belonged to Rebolledo. Rebolledo later indicated the individual who had donated the curtains had asked her to return them, and still later that she had already returned the curtains to the donor. Rebolledo admits to making these statements, and that none of them were true, but further testified that she was convalescing from her surgery at the time and was "under heavy medication." According to Rebolledo, she also "felt under pressure" when asked about the curtains, and she said what she felt she needed to say in order to be left alone during her leave.

The Escuela de la Fe offices where the curtains were initially located were open and accessible to all trainers, students, and volunteers. It is undisputed that the curtains were ultimately found in a closet located on HN property sometime after Rebolledo was fired.

For some time after the curtains were found, HN continued to maintain that Rebolledo had stolen them. Rebolledo does not dispute that HN was conducting an investigation into the missing curtains during some of that time, but characterizes HN's investigation as "haphazard" and a "sham."

### G. *Rebolledo's February 13, 2017 Termination*

On February 13, 2017, while still off work in connection with her surgery, Rebolledo received a certified letter from Cervantes informing her that her employment with the organization had been terminated. The letter stated that Rebolledo's employment was being terminated "because [HN] learned that (1) within the last week [Rebolledo] contacted professors from the Escuela de la Fe in an attempt to persuade them to leave [HN] and join [her] in a new competing school; (2) within the last week [Rebolledo] contacted Escuela de la Fe professors and told them not to attend the February 2017 Mujeres de Fe [C]ongreso and as a result, there was nobody from the school to tend the Escuela de la Fe booth; and (3) [Rebolledo] removed and/or disposed of curtains and other items that were donated to the Escuela de la Fe without authorization" (italics omitted) and "[w]hen [Rebolledo] [was] asked why [she] did so, [she] first indicated that the curtains belonged to [her] but then said that [she] returned them to the donor. However, [HN] underst[ood] from the donor . . . [they] were never returned to him."

9

A few days later, Rebolledo filled out an HN form requiring her to certify that she had returned to HN "all supplies, equipment, property, and proprietary information." Under the form's entry for "USB [d]rive of Escuela de la Fe [m]aterials," she indicated, "[n]ever receive[d] one." During her deposition, Rebolledo testified that she *had* received a USB drive containing Escuela de la Fe training materials, but from the Escuela de la Fe central office in Mexico, rather than from HN. She further testified that she last recalled seeing the USB drive in her desk at HN. The parties dispute whether the training materials contained on the USB drive were confidential and/or proprietary. HN employees testified they were unable to locate the USB drive.

### H. *Orozco and Arango's February 17, 2017 Statements to HN Employees and Volunteers Regarding Rebolledo*

Rebolledo later learned that Orozco and Arango had spoken with Escuela de la Fe trainers and volunteers regarding her termination and the allegations in the termination letter during a meeting at the Escuela de la Fe office on February 17, 2017. The parties do not dispute that this meeting took place, but there is very little information in the record regarding what specifically was said. Rebolledo testified that she heard a recording of the meeting that a volunteer who attended made using her cell phone. Rebolledo recalled that the recording reflected Orozco answering questions from others present about Rebolledo's termination, and Orozco "mention[ing] that he couldn't talk about this but that they were going to use all their power and resources to make [Rebolledo] return to [HN] the databank that [she] had taken from them and all the other things that were missing." Rebolledo's declaration also describes hearing what sounded like

10

Arango stating that HN was considering pressing criminal charges against Rebolledo. Rebolledo could not recall whether Arango's statements were in response to questions.

Regarding Orozco's reference to the Escuela de la Fe database, Rebolledo offered uncontradicted testimony that the Los Angeles chapter database is digitally stored as an Excel file on an HN computer, and that a global Escuela de la Fe database is stored in a separate online server. There is no evidence in the record suggesting Rebolledo took a copy of either database.

### I. *Rebolledo's Personnel Records*

On July 21, 2017, Rebolledo's counsel made a formal request for her personnel file and payroll records. The records HN initially provided were missing six pages, which HN ultimately produced to Rebolledo two years later in connection with the litigation. The parties do not dispute that three of these pages were photographs related to the curtains. Although Rebolledo disputes that the remaining three pages related to an investigation of possible theft, the only competent evidence in the record regarding the content of these three pages is a 2019 declaration of Rene Heredia, then-executive director of HN. Through his declaration, Heredia testified that the six pages of documents HN did not provide prior to litigation were documents and photographs "related to the investigation of the missing curtains and USB [d]rive."

### PROCEEDINGS BELOW

On February 22, 2018, Rebolledo filed a complaint against HN, alleging causes of action based on the FEHA—namely, retaliation, disability discrimination, and failure to engage in the interactive process—as well as causes of action for wrongful termination, defamation, intentional and negligent infliction

11

of emotional distress, unfair business practices, and failure to comply with Labor Code section 1198.5, subdivision (h), which requires an employer to produce certain employee records upon request. (See Lab. Code, § 1198.5, subd. (h).) HN filed an answer and, following the conclusion of discovery, moved for summary judgment.

The trial court granted summary judgment on all causes of action in favor of HN.

The trial court entered judgment in favor of HN and dismissed the case against HN.[4] Rebolledo appealed the judgment entered as to HN following the trial court's order granting HN's motion for summary judgment.

## DISCUSSION

Code of Civil Procedure section 437c, subdivision (c) "requires the trial judge to grant summary judgment if all the evidence submitted, and 'all inferences reasonably deducible from the evidence' and uncontradicted by other inferences or evidence, show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Adler v. Manor Healthcare Corp.* (1992) 7 Cal.App.4th 1110, 1119, quoting Code Civ. Proc., § 437c, subd. (c).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

Our review of a trial court's grant of summary judgment is

---

[4] It appears Rebolledo added at least one HN employee as an individual defendant at some point, but no individual defendant is a party to this appeal.

12

de novo. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) We therefore independently analyze the evidence in the record that was presented to the trial court, except that to which objections were properly sustained, under the same summary judgment legal framework applicable in the trial court. In so doing, "[w]e liberally construe the evidence in support of the party opposing summary judgment [citation], and assess whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment under applicable legal standards." (*Loggins, supra,* 151 Cal.App.4th at p. 1109.)

The party moving for summary judgment bears the initial burden of producing a prima facie showing that there is no triable issue of material fact. (*Aguilar, supra,* 25 Cal.4th at p. 850.) Where, as here, the moving party is a defendant, it may make such a showing by establishing the plaintiff cannot prove one or more elements of plaintiff's claim, or by proving an affirmative defense. (See Code Civ. Proc., § 437c, subds. (o)(1)-(2) & (p)(1)-(2); *Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 355−356 (*Guz*).)

### A. *Wrongful Termination, Discrimination, and Retaliation Causes of Action*

#### 1. Elements

Rebolledo's discrimination, wrongful discharge, and retaliation claims all require Rebolledo to prove that HN fired her because she requested and took time off due to her breast surgery.

The elements of a discrimination claim under the FEHA are: "(1) [the plaintiff] suffers from a disability [or medical condition]; (2) he [or she] is otherwise qualified to do his [or her] job; and, (3) he [or she] was subjected to adverse employment

13

action because of his [or her] disability [or medical condition]."
(*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th
864, 886; see Gov. Code, § 12940, subd. (a) [referring to both
disability and "medical condition"].)  Rebolledo argues that HN
fired her because she took time off to treat a medical condition
(the cysts in her breasts), and that HN thereby engaged in
discrimination prohibited by the FEHA.  Because discharging
an employee in a manner that violates the anti-discrimination
provisions of the FEHA may constitute a violation of public
policy as well (see *Stevenson v. Superior Court* (1997) 16 Cal.4th
880, 897), Rebolledo argues that her allegedly discriminatory
firing was also a discharge in violation of public policy.  (See
*Nosal-Tabor v. Sharp Chula Vista Medical Center* (2015) 239
Cal.App.4th 1224, 1234−1235 [" '[t]he elements of a claim for
wrongful discharge in violation of public policy are (1) an
employer-employee relationship, (2) the employer terminated
the plaintiff's employment, (3) the termination was substantially
motivated by a violation of public policy, and (4) the discharge
caused the plaintiff harm' "].)

The elements of a retaliation claim under the FEHA are
" ' "(1) [the plaintiff] engaged in a 'protected activity,' (2) the
employer subjected the employee to an adverse employment
action, and (3) a causal link existed between the protected
activity and the employer's action." ' "  (*Nealy v. City of
Santa Monica* (2015) 234 Cal.App.4th 359, 380 (*Nealy*).)
"[P]rotected activity takes the form of opposing any practices
forbidden by FEHA or participating in any proceeding conducted
by [certain fair employment and housing entities]."  (*Ibid.*)
Rebolledo argues that she "engaged in protected activity
by requesting a reasonable accommodation for her breast
surgery . . . and . . . [taking] leave without any express approval

14

or disapproval by [HN] after [submitting] her third doctor's note,"**5** and that HN fired her as a result, thereby engaging in retaliation actionable under FEHA.

## 2.     The *McDonnell-Douglas* framework

Because California law recognizes "that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially" *(Guz, supra,* 24 Cal.4th at p. 354), California courts employ the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green* (1973) 411 U.S. 792 *(McDonnell Douglas)* to the proof of all disparate treatment-based claims under the FEHA, such as disability discrimination and retaliation claims, as well as to claims for termination in violation of public policy.  (See *Guz, supra,* at p. 354 [discrimination]; *Loggins, supra,* 151 Cal.App.4th at p. 1109 [wrongful termination and retaliation].)  "[B]y successive steps of increasingly narrow focus, the [so-called *McDonnell Douglas* test] allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra,* 24 Cal.4th at p. 354.)  In the first stage of the test, " 'the plaintiff must show (1) he or she engaged in a "protected activity [or was a member of a protected class],"￼ (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity [or employee's membership in protected class] and the employer's action.' [Citation.]  If the employee

---

**5** The parties have not briefed whether this meets the definition of protected activity for the purposes of a retaliation claim.  Whether or not it does would not affect our ultimate disposition of this appeal.  We therefore need not and do not decide the issue.

15

successfully establishes these elements and thereby shows a prima facie case exists, the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory [and nondiscriminatory] reason for the adverse employment action. [Citation.] If the employer produces evidence showing a legitimate reason for the adverse employment action, 'the presumption of retaliation " ' "drops out of the picture," ' " ' [citation], and the burden shifts back to the employee to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual. [Citation.]" (*Loggins, supra,* at p. 1109.)

" 'A defendant employer's motion for summary judgment slightly modifies the order of these [*McDonnell Douglas*] showings. If, as here, the motion for summary judgment relies in whole or in part on a showing of nondiscriminatory reasons for the discharge, the employer satisfies its burden as moving party if it presents evidence of such nondiscriminatory reasons that would permit a trier of fact to find, more likely than not, that they were the basis for the termination. [Citations.] To defeat the motion, the employee then must adduce or point to evidence raising a triable issue, that would permit a trier of fact to find by a preponderance that intentional discrimination occurred.' " (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1005 (*Scotch*).) " 'In determining whether these burdens were met,' " we "liberally constru[e]" the employee-plaintiff's evidence " 'while strictly scrutinizing [the defendant-employer's]' " evidence. (*Ibid*.) Liberal scrutiny does not, however mean no scrutiny: "The employee's evidence must relate to the motivation of the decision makers and prove, by nonspeculative evidence, 'an actual causal link between prohibited motivation and termination.' " (*Featherstone v. Southern California Permanente*

*Medical Group* (2017) 10 Cal.App.5th 1150, 1159.)

### 3. Evidence of nondiscriminatory and/or nonretaliatory motive

We agree with the trial court that HN met its burden under the *McDonnell Douglas* test, because it presented "extensive evidence regarding alternative reasons for discharging Rebolledo" that have nothing to do with her requests for medical leave or medical condition. Namely, it is undisputed that Rebolledo told several inconsistent stories when asked about the whereabouts of the curtains (whether or not the curtains were later found); that she emailed Escuela de la Fe trainers telling them there would be no HN booth at the Mujeres de la Fe Congreso without first confirming this with her supervisors; and that, whether or not Rebolledo initiated the text exchange in which Rebolledo did so, she asked an Escuela de la Fe trainer whether he would "come with us" or "stay with [HN]," then asked him to keep their discussion a secret. To satisfy HN's burden, these actions need not support a reason for firing Rebolledo that is "wise or correct"—just "nondiscriminatory." (*Guz, supra*, 24 Cal.4th at p. 358.) "[T]he ultimate issue is simply whether the employer acted with a motive to discriminate illegally. Thus, 'legitimate' reasons [citation] in this context are reasons that are facially unrelated to prohibited bias, and which, if true, would thus preclude a finding of discrimination. [Citations.]" (*Ibid.*, italics omitted.) HN identified and provided undisputed evidence supporting such legitimate reasons.

We reject Rebolledo's argument that, because she engaged in the conduct HN cited as the basis for her discharge during what she characterizes as a medical/disability leave, that conduct is "disability related," such that firing her based on it is tantamount to firing her for having a disability. Rebolledo cites

a line of cases that address "workplace misconduct *caused by a disability*." (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 148, italics added [employee outbursts and threatening actions at work caused by her bipolar disorder]; *Humphrey v. Memorial Hospitals Assn.* (9th Cir. 2001) 239 F.3d 1128, 1140.) Rebolledo's claimed disability/medical condition was a diagnosis of cysts found in her breasts. She cannot reasonably attribute the texts, email, and statements HN cites as a basis for firing her to the cysts in her breasts. Her arguments to the contrary—that she was heavily medicated from her surgery to remove the cysts and/or on medical leave when she made the statements— stretches the concept of misconduct "caused" by a disability far too thin. (*Wills v. Superior Court, supra,* at p. 148.)

### 4. Evidence of pretext

Because HN produced evidence of a legitimate reason for firing Rebolledo, the burden shifted to Rebolledo to " 'demonstrate a triable issue by producing substantial evidence that [HN's] stated reasons were untrue or pretextual . . . such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination' " or retaliation.[6] (See *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1529 (*McGrory*).) As evidence of pretext,

---

[6] Rebolledo's argument that an employee opposing an employer's summary judgment motion does not have the burden of proving disparate treatment oversimplifies the law. An employee-plaintiff "*[does]* have a burden, in the face of [a moving employer-defendant's] showing of nondiscriminatory [and nonretaliatory] reasons, to show there was nonetheless a triable issue that decisions leading to [the plaintiff's] termination were actually made on [a] prohibited basis." (*Guz, supra,* 24 Cal.4th at p. 360.)

18

Rebolledo points to: (1) her declaration and testimony in which she denies engaging in any of the behavior HN cites as a basis for her discharge; (2) the fact that the curtains ultimately were found on HN property and went missing during an office move from a building that was open to the public; (3) her testimony and declaration providing additional context for her text to Valenzuela and email regarding the Mujeres de la Fe Congreso; (4) evidence she argues suggests HN's investigation regarding the curtains was a sham; and (5) the timing of her firing in relation to her taking time off for surgery. This showing is insufficient to create a triable issue of fact as to pretext, even viewing the evidence in the light most favorable to Rebolledo's claims and resolving all conflicts in the evidence in her favor.

The first three aspects of the record Rebolledo identifies at most tend to suggest that HN's stated factual basis for firing Rebolledo was wrong or mistaken—that is, that Rebolledo did not, in fact, steal curtains, attempt to poach trainers, or intentionally sabotage HN's presence at the Mujeres de la Fe Congreso. But to make the requisite showing of pretext, Rebolledo "cannot 'simply show [HN]'s decision was wrong, mistaken, or unwise. Rather, [she] " ' "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' [citation], and hence infer 'that the employer did not act for the [ . . . asserted] non-discriminatory reasons.' [Citations.]" [Citations.]' [Citation.]" ' " (See *Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834.) Rebolledo identifies no such inconsistencies or implausibility. That the curtains were later found at HN is not a basis on which a reasonable factfinder

19

could deem HN's claim that it believed she stole the curtains because she repeatedly lied about their whereabouts "unworthy of credence." (See *Guz, supra*, 24 Cal.4th at p. 361.) Similarly, HN's claim that it fired Rebolledo because she made statements that can be reasonably interpreted as reflecting disloyalty to HN does not become "unworthy of credence" based on Rebolledo offering innocent explanations for those statements *after* HN decided to fire her. (See *ibid.*; see also *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 224 (*Hanson*).) Nor does it support the conclusion that there was " 'no basis in fact' " for HN's claimed understanding of Rebolledo's statements. (*Hanson, supra*, at p. 224.) Whether Rebolledo has shown pretext depends not on whether a reasonable factfinder could find Rebolledo actually *did* steal curtains or actually *was* disloyal to HN. (See *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 436 ["[i]t is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case"].) Rather, the correct inquiry is whether the evidence HN offered suggesting HN fired Rebolledo for these reasons is so weak, there cannot be a " ' "causal connection" ' " between those reasons and her discharge.[7] (*Clark v. Claremont University Center* (1992) 6 Cal.App.4th 639, 665.) The record would not allow a reasonable factfinder to reach the latter conclusion.

Rebolledo next argues that evidence regarding HN's investigation into the alleged theft of the curtains suggests

---

[7] An employee can also establish pretext by offering more direct evidence of bias or discrimination by the employer, but Rebolledo does not argue she presented, nor does our review of the record identify, any such evidence.

the investigation was a sham, and thus HN's claim that it fired Rebolledo because of theft is pretextual. Rebolledo points specifically to the fact that Orozco, Cervantes, and Arango were not all involved in the investigation, and that HN continued its investigation after the curtains were found. A reasonable jury could not infer from this evidence that HN's investigation was disingenuous. Rebolledo identifies no reason why all three of these individuals should have been involved in the investigation. Nor does the fact that the curtains were found necessarily mean that they were not stolen. And HN continuing its investigation thereafter—as well as after Rebolledo was fired—actually suggests it was *not* a sham.

The final way in which Rebolledo seeks to establish pretext—the timing of her discharge relative to taking time off—also is not a basis on which a reasonable factfinder could disbelieve HN's stated grounds for termination. Although Rebolledo correctly notes that a trier of fact may reasonably infer discrimination and pretext from circumstantial evidence, including timing, timing cannot be the *only* evidence of pretext. (See *Loggins, supra,* 151 Cal.App.4th at p. 1112 [temporal proximity between the protected action and adverse employment action is alone insufficient to establish pretext]; *Scotch, supra*, 173 Cal.App.4th at p. 1009 [same].) Here, as discussed above, none of the other evidence Rebolledo identifies suggests pretext. Thus, the timing of her termination does not create a triable issue of fact, whether considered alone or in connection with the other evidence she identifies.

In sum, although we agree with Rebolledo that a plaintiff may prove pretext purely through circumstantial evidence, and/or through the weakness of evidence put forth by the employer, Rebolledo "failed to demonstrate ' " ' "such

21

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" ' " ' in [HN's] reasons [for firing her] that a reasonable trier of fact could rationally find those reasons not credible. [Citation.]" (See *Scotch, supra*, 173 Cal.App.4th at p. 1009.) Thus, her "claim[s] depend[ ] on an inference, drawn solely from the timing of events," that HN fired her because of her requests for leave, yet "[a] reasonable jury could not draw that inference, and neither do we." (See *ibid.*)

## B.     *Failure to Engage in the Interactive Process*

The FEHA imposes an affirmative duty on employers "to make [a] reasonable accommodation for the known disability of an employee unless doing so would produce undue hardship to the employer's operation." (*Nealy, supra*, 234 Cal.App.4th at p. 373, citing Gov. Code, § 12940, subd. (m).) The law also requires that "in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition," an employer "engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any." (Gov. Code, § 12940, subd. (n).) "Once the interactive process is initiated, the employer's obligation to engage in the process in good faith is continuous. . . . [¶] Both employer and employee have the obligation 'to keep communications open' and neither has 'a right to obstruct the process.' [Citation.] 'Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with

22

the party who fails to participate in good faith.' [Citation.]" (*Scotch, supra*, 173 Cal.App.4th at pp. 1013−1014.)

An employer's duty to begin the interactive process is triggered when an employer knows or should know that an employee has a disability or medical condition and knows or should know the limitations it places on the employee. (*Scotch, supra,* 173 Cal.App.4th at p. 1013 [" '[w]here the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, . . . the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations' "]; see Gov. Code, § 12940, subd. (n).) Assuming—without deciding—that Rebolledo's request for leave to undergo cyst-removal surgery triggered HN's duty to engage in the interactive process, the evidence creates no triable issue of fact as to whether HN failed to perform this duty.

Rebolledo argues that HN failed to engage in the interactive process in good faith because HN employees "forced her to keep working after [receiving] the January 5, 2017 doctor's note," meaning "they [had] feigned consent to her request back in November and December of 2016, but in January failed to follow through." As further evidence of HN's alleged failure to participate in good faith in the interactive process, Rebolledo cites that fact that HN "did not expressly approve" her leave request on January 12, 2017, and that HN employees "continuously contacted her regarding work . . . while she was on protected leave." But nothing in the FEHA requires an employer to grant the exact accommodation requested by the employee without any adjustments; to the contrary, the goal of the interactive process is finding a way to reasonably accommodate

23

limitations on the employee created by her disability or medical condition without imposing undue hardship on the employer. On the facts in this record, that is precisely what happened. In 2016 when Rebolledo requested leave for surgery, Orozco and Cervantes told her it was "fine," and Orozco asked her to try and leave everything at work in order before her absence. In January 2017, when she presented a doctor's note with more specific dates for her desired leave, HN did not permit Rebolledo to start time off immediately, but rather informed Rebolledo she would need to complete a series of tasks in order to facilitate her time away from the office. After Rebolledo did so, she took several weeks off from work, as HN had indicated in 2016 it would allow her to do. That HN did not expressly grant the leave a second time in response to the January 12, 2017 note does not mean HN was engaging in bad faith in the interactive process—particularly since HN did not object to or prevent Rebolledo from taking time off to prepare for, undergo, and recover from her surgery. Nor does Rebolledo cite any authority for the proposition that an employer contacting an employee about work-related matters during medical leave, or requiring an employee to use sick days or unpaid leave to facilitate a medical leave, renders the employer's efforts to engage in the interactive process disingenuous, or the medical leave an unreasonable accommodation. (See *Hanson, supra,* 74 Cal.App.4th at p. 226 ["in appropriate circumstances, reasonable accommodation can include providing the employee accrued paid leave or additional unpaid leave for treatment"].) There is nothing in the record from which the jury could infer that HN failed to engage in good faith in the interactive process.

24

## C.    *Defamation Claim*

Rebolledo's defamation claim is based on Orozco and Arango's statements during the February 17, 2017 meeting with HN volunteers and personnel that HN was investigating Rebolledo for stealing and considering pressing charges against her.  The trial court concluded that undisputed facts established the common interest privilege protected these statements.  The common interest privilege is codified in Civil Code section 47, subdivision (c), which provides in pertinent part that a publication or broadcast is privileged if made "[i]n a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."  (Civ. Code, § 47, subd. (c); see *Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1368 (*Noel*).)  Determining whether this privilege applies to an allegedly defamatory statement "involves a two-step inquiry," and "[o]n summary judgment, . . . the defendant bears the burden of showing in the first instance that there is no triable issue of fact as to [both] issue[s]—that the statement was made on a privileged occasion, and that it was made 'without malice.'"  (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 729.)

As to the first step, Civil Code section 47, subdivision (c) "appl[ies] to statements by management and coworkers to other coworkers explaining why an employer disciplined an employee."  (*McGrory*, *supra*, 212 Cal.App.4th at p. 1538.)  The trial court analogized such statements to those at issue here, because Orozco and Arango made them in the context of HN volunteers'

25

questions about Rebolledo's firing, and rejected Rebolledo's argument that volunteers should be treated differently than employees for these purposes. We agree with the trial court. The logic behind the privilege applying to employer statements about employee misconduct is that such open communications is necessary "so that (1) appropriate action may be taken against the employee; (2) the danger of such breaches occurring in the future may be minimized; and (3) present employees may not develop misconceptions that affect their employment with respect to certain conduct that was undertaken in the past. Where an employer seeks to protect his own self-interest and that of his employees in good faith and without abusing the privilege afforded him, the privilege obtains even though it is substantially certain that emotional distress will result from uttered statements." (*Deaile v. General Telephone Co.* (1974) 40 Cal.App.3d 841, 849–850.) This logic also applies to volunteers of an organization, as they, too, have an interest in the organization, may have information about the possible misconduct of the disciplined employee, and may just as easily "develop misconceptions that affect their employment with respect to certain conduct that was undertaken in the past." (*Id.* at p. 849.)

As to the second step, Rebolledo argues that HN has not met its burden of establishing that the communications were made without malice. " ' "The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff or by a showing that the defendant lacked reasonable ground for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights [citations]." ' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 721 (italics

26

omitted), implicitly overruled on another ground as stated in *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 380.) Rebolledo argues that HN has offered nothing to counteract what she characterizes as evidence of Orozco and Arango's reckless disregard for the truth: Namely, that they accused Rebolledo of stealing items from a publicly accessible space that were later found on HN property. In order for this evidence to provide a basis on which a jury could find such a reckless disregard for the truth, however, it must establish that the speaker "lacked reasonable grounds for belief in the truth of the [statement]." (*Ibid.*) As discussed above, HN *had* reasonable grounds for believing Rebolledo may have stolen HN property. Rebolledo made multiple false statements when asked about the then-missing curtains, and appeared to be making a false statement by indicating on the property return form that she had never received the missing USB drive. Although Rebolledo has since offered context for these statements, she did not provide that context to HN at the time. (See *Noel, supra,* 113 Cal.App.4th at p. 1371 [" '[i]nherent in the concept of reckless disregard for truth is the notion that it is the speaker's belief regarding the accuracy of his [or her] statements, rather than the truth of the underlying statements themselves, that is relevant to the malice determination' "].) She did not, for example, indicate on the form that she had never received a USB drive *from HN*, but had received one from the central office in Mexico; nor is there any evidence suggesting that, before the February 17, 2017 meeting, Rebolledo clarified to HN that she had been on medication when asked questions about the missing curtains. Finally, that the curtains were found on HN property *after* the February 17, 2017 meeting does render the statements at the meeting about possible theft reckless.

27

HN thus established as a matter of law that the allegedly defamatory statements were subject to Civil Code section 47, subdivision (c), and that nothing in the record supported the conclusion that they were made with actual malice. The judgment in HN's favor on Rebolledo's defamation claims was therefore correct.

## D. *Negligent and Intentional Infliction of Emotional Distress Claims*

The trial court concluded that Rebolledo's intentional infliction of emotional distress (IIED) and negligent infliction of emotional distress (NIED) claims were barred by the Workers' Compensation Act (the WCA), which provides the exclusive remedy for an injury sustained by an employee in the course and scope of employment. (See Lab. Code, §§ 3600, subd. (a), 3602, subd. (a); *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 813 (*Vacanti*).) The WCA exclusivity rule is based on the "presumed 'compensation bargain' " in which, in exchange for limitations on the amount of liability, the employer assumes liability regardless of fault for injury arising out of and in the course of employment. (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 16.) The compensation bargain encompasses both psychological and physical injury arising out of and in the course of the employment. (Lab. Code, §§ 3600, subd. (a), 3208.3, subd. (a).) The general rule of workers' compensation exclusivity "applies only if the risks resulting in the injury were encompassed within the 'compensation bargain' " which "does not encompass conduct that contravenes a fundamental public policy or exceeds the risks inherent in the employment relationship." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 366; accord, *Vacanti, supra,* 24 Cal.4th at pp. 811–812.) Thus, "some claims, including those based on . . .

28

discrimination or other conduct contrary to fundamental public policy, are not subject to the exclusivity provisions of the workers' compensation law. [Citation.] Thus, such claims may be the subject of both workers' compensation proceedings and civil actions." (*Claxton v. Waters* (2004) 34 Cal.4th 367, 373.)

Rebolledo argues that her IIED and NIED claims against HN "arise from HN's failure to engage in the interactive process in good faith, discrimination, retaliation, and subsequent defamation of . . . Rebolledo, all acts which fall outside the WCA exclusivity rule." For the reasons discussed above, however, the court correctly entered judgment in HN's favor on the interactive process, discrimination, retaliation, and defamation claims. Rebolledo thus cannot avoid the WCA exclusivity rule on the basis that her IIED and NIED claims are premised on conduct that is exempt from the rule.

### E.     *Failure to Provide Personnel Records Claim*

Labor Code section 1198.5 provides that "[e]very current and former employee, or his or her representative, has the right to inspect and receive a copy of the personnel records that the employer maintains relating to the employee's performance or to any grievance concerning the employee" within a certain period of time after making a proper request for same. (Lab. Code, § 1198.5, subd. (a); see *id*., § 1198.5, subd. (b).) If an employer fails to comply with this obligation, "the current or former employee or the Labor Commissioner may recover a penalty of seven hundred fifty dollars ($750) from the employer." (Lab. Code, § 1198.5, subd. (k).) The section does not, however, require an employer to turn over "[r]ecords relating to the investigation of a possible criminal offense." (*Id.*, § 1198.5, subd. (h)(1).)

29

Rebolledo seeks recovery of the statutory penalty provided for in Labor Code section 1198.5 based on HN's initial failure to provide her with six pages of her personnel file—which HN has since produced to her—within the amount of time set forth in the section. HN contends that it was not obligated to provide these records in response to Rebolledo's July 2017 request because they related to a then-ongoing investigation of possible theft (of the USB drive and curtains). Rebolledo in turn contends that the investigation was a sham, and that three of the six pages initially withheld were unrelated to the purportedly stolen curtains and/or USB drive in any event. Above, we rejected Rebolledo's arguments that there is a basis on which a reasonable jury could conclude that the investigation was a sham. Nor is there any competent evidence in the record contradicting Heredia's description of the initially withheld pages as relating to HN's investigation into potential theft. Rebolledo argues HN admitted that some of the pages initially withheld do not relate to a criminal investigation, because HN's counsel stated at a deposition that the initially withheld pages contained "emails where your client [Rebolledo] admits that she's trying to start a new school, where your client [Rebolledo] admits she wants somebody to change a password so she can access that information." Counsel's statement, however, is not competent evidence of the content of the documents. In any case, HN counsel's description is not necessarily inconsistent with HN's contention that the six pages at issue relate to an HN investigation of possible theft. The documents themselves were made available to Rebolledo in litigation, but she offered neither these, nor any other evidence, to contradict the otherwise uncontradicted Heredia declaration.

HN thus met its burden of establishing, based on uncontradicted evidence, that there is no triable issue of fact regarding Rebolledo's Labor Code section 1198.5 claim.

### F.   *Unfair Competition Law Claim*

California's Unfair Competition Law (UCL), Business and Professions Code section 17200 et seq., authorizes civil actions against, inter alia, any business entity that has engaged in "any unlawful . . . business act or practice" (Bus. & Prof. Code, § 17200; see *id.*, §§ 17203, 17204, 17206), broadly interpreted to mean " ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' [Citation.]" (*People v. McKale* (1979) 25 Cal.3d 626, 632.)  Where, as here, a claim depends on the allegation that a practice is " ' "unlawful" ' " under some other law, defeating the underlying claim extinguishes the UCL claim as well.  (See *Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050, 1060 [" '[i]f the [underlying] claim is dismissed, then there is no "unlawful" act upon which to base[ ] the derivative Unfair Competition claim' "].)

Because we affirm the judgment in HN's favor on all of Rebolledo's other causes of action, we likewise affirm the trial court's judgment in HN's favor on Rebolledo's UCL cause of action.

## DISPOSITION

We affirm the trial court's judgment in Hombre Nuevo's favor.  Hombre Nuevo is awarded its costs on appeal.

<u>NOT TO BE PUBLISHED</u>.


                                                 ROTHSCHILD, P. J.

We concur:


CHANEY, J.


FEDERMAN, J.*

---

**\*** Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.